PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JABER HILMI HAMMOUDA, | ) |
|         Plaintiff-Petitioner, | ) CASE NO. 4:25-cv-2696 |
| | ) |
|         v. | ) JUDGE BENITA Y. PEARSON |
| | ) |
| DEPARTMENT OF HOMELAND SECURITY, *et al.*, | ) |
| | ) **ORDER** |
| | ) [Resolving ECF No. 1] |
|         Respondents-Defendants.[1] | ) |

Pending before the Court is Jaber Hilmi Hammouda's Petitioner for Writ of *Habeas Corpus* pursuant to 28 U.S.C. § 2241. ECF No. 1. Respondents timely submitted a Return of Writ and Motion to Dismiss. ECF No. 6. The Court conducted a telephonic hearing, during which the parties' counsel presented oral argument regarding their respective positions. Consistent with the Court's Order (ECF No. 9), Respondents supplemented their Motion to Dismiss with a declaration detailing Petitioner's impending removal to the occupied Palestinian territories. ECF No. 10. Petitioner responded. ECF No. 11. Being duly advised, having reviewed the parties' briefs and the applicable law, Respondent's Motion to Dismiss (ECF No. 6) is denied. In light of the significant likelihood of removal, Petitioner's writ of *habeas corpus* (ECF No. 1) is also denied.

---

    [1] Although the parties are labeled Petitioner-Plaintiff and Respondents-Defendants, the Court will refer to the parties a Petitioner and Respondents, respectively.

(4:25CV2696)

## I. BACKGROUND

### A. Factual Background

Petitioner is a 40-year-old Palestinian[2] who has lived in the United States for approximately 17 years. He is married to a U.S. citizen, and they have three minor children, ages 16, 14, and 1. ECF No. 1, ¶ 17.

On May 31, 2019, Petitioner was convicted of conspiracy to distribute and possession with intent to distribute marijuana and oxycodone, in violation of 21 U.S.C. § 846, and sentenced to 30 months incarceration. ECF No. 1, ¶ 18. As a result, he was subject to removal proceedings under the Immigration and Nationality Act ("INA"). Notice to Appear, ECF No. 1-7. After completing his sentence, Petitioner was afforded an individual calendar hearing,[3] and on June 16, 2020, an immigration judge ordered that he be removed to Israel. ECF No. 1, ¶ 20. Petitioner did not appeal the order.

Following the issuance of the removal order, Immigration and Customs Enforcement ("ICE") detained Petitioner for 90 days before releasing him on September 14, 2020, under an

---

[2] Although neither party disputes that Petitioner is a national and citizen of Palestine, the Government's records inconsistently recognize his nationality and citizenship as such. In its Notice to Appear, issued June 7, 2019, ICE alleged petitioner is a native and citizen of Israel. ECF No. 1-7 at PageID #: 43. In the Decision to Continue Detention, issued on September 4, 2025, ICE determined that Petitioner is "a native and citizen of Palestine." ECF No. 1-3 at PageID #: 30.

[3] An individual calendar hearing (or merits hearing) is part of the removal process during which a noncitizen may challenge removability through evidence, motions, and witnesses. A merits hearing is conducted before an immigration judge responsible for deciding whether an individual should be admitted into or removed from the country. These decisions are appealable to the Board of Immigration Appeals ("BIA"). See Executive Office for Immigration Review | 4.16 - Individual Calendar Hearing | United States Department of Justice.

2

(4:25CV2696)

Order of Supervision ("OSUP") because ICE had failed to obtain travel documents to effectuate his removal and determined that he did not pose a danger to the community or a flight risk. It is undisputed that Petitioner's release was consistent with 8 U.S.C. § 1231(a)(1).[4] Since his release, Petitioner has complied with all conditions of his OSUP, including annual check-ins with ICE officers. ECF No. 1, ¶¶ 21–22.

### B. Respondents' Removal Efforts

Petitioner appeared for his annual check-in on March 6, 2025, as required by the conditions of his OSUP. There were no indications that he posed a threat to the community or a flight risk and, therefore, he was not detained. ECF No. 1, ¶ 23. On June 2, 2025, he was ordered to appear before ICE officers again. He did so the next day and was immediately arrested. He has been in detention at Northeast Ohio Correctional Center ("NEOCC") since June 3, 2025. ECF No. 1, ¶ 24.

ICE conducted a 90-day detention review on September 4, 2025, indicating that it "expect[ed] to receive the necessary travel document to effectuate [Petitioner's] removal, and removal is practicable, likely to occur in the reasonably foreseeable future, and in the public interest." ECF No. 1, ¶ 28; ECF No. 1-3. At 180 days, ICE conducted another detention review because it had not effectuated Petitioner's removal within the second 90-day period. ECF No. 1, ¶ 30. On December 4, 2025, Deportation Officer Ryan Serevitch told Petitioner's counsel that

---

[4] Section 1231(a)(1)(A) provides: "Except as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days[.]" Section 1231(a)(3) provides: "If the alien does not leave or is not removed within the removal period, the alien, pending removal, shall be subject to supervision under regulations prescribed by the Attorney General."

3

(4:25CV2696)

ICE Headquarters was "nearing final approval" of Petitioner's travel documents and, "[i]f approved, he will be nominated for removal to Palestine in mid-January." ECF No. 1-4.

During a telephonic hearing conducted by the Court on January 7, 2026, Respondents presented a declaration from Officer Serevitch attesting to the following, in part:

> 10. On December 31, 2025, a Detention and Deportation Officer ("DDO") with ICE HQ RIO[5] notified ERO[6] Detroit (Cleveland) that two special charter missions for removals to Israel and the occupied Palestinian territories are scheduled to depart by February 1, 2026. According to the DDO, Hammouda would be manifested for removal on these upcoming charter missions.
>
> 11. On January 5, 2026, ICE Air Operations notified ERO Detroit (Cleveland) that Hammouda is manifested for removal on the upcoming charter missions to Israel and the occupied Palestinian territories. This notification included instructions to promptly transfer Hammouda to ICE's removal staging facility in Mesa, Arizona.
>
> 12. Based on the information provided by ICE HQ RIO, since April 2025, ICE has successfully removed multiple individuals to the occupied Palestinian territories with special transit permission from the Government of Israel.

ECF No. 8-1, ¶¶ 10–12. Respondents submitted a supplemental declaration clarifying the following:

> 4. Subject to unforeseen circumstances . . . Hammouda is manifested as an alternate passenger on the first flight and a primary on a second flight. Both flights are scheduled to depart the United States from Mesa, Arizona between January 20 and February 1, 2026. . . .
>
> 6. Hammouda is currently scheduled to be transported to the [ICE Air Operations] operational location in Mesa, Arizona on or before January 16, 2026. . . .

---

[5] ICE Headquarters Removal and International Operations. ECF No. 8-1, ¶ 9.
[6] ICE Enforcement and Removal Operations. ECF No. 8-1, ¶ 1.

(4:25CV2696)

> 8. According to the most recent information provided to me by RIO personnel on January 8, 2026: (i) the list of manifested passengers for these scheduled charter missions has been provided to the Government of Israel; (ii) the ERO Attaché in Tel Aviv expects to receive approval to transit to the occupied Palestinian territories; and (iii) removals to the occupied Palestinian territories are not dependent on valid passports/travel documents and can be completed with expired Palestinian passports/travel documents.

ECF No. 10, ¶¶ 4, 6, 8. Petitioner argues that the declarations are deficient because they contain vague, generalized plans, rather than specific itinerary information, travel documentation, or approval confirmation from the Israel government or Palestinian Authority. ECF No. 11.

## II.     DISCUSSION

### A. Jurisdiction

Respondents argue that the Court lacks jurisdiction to prevent Petitioner's removal because 8 U.S.C. § 1252(g) abrogates judicial review of removal orders. ECF No. 6 at PageID #: 62. The Court disagrees.

While the Sixth Circuit Court of Appeals and the United States Supreme Court acknowledge that § 1252(g) bars judicial review over "all claims arising from deportation proceedings," *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 19 (2020); *see Hamama v. Adducci*, 912 F.3d 869, 877 (6th Cir. 2018) (A "district court's jurisdiction over the detention-based claims is independent of its jurisdiction over the removal-based claims."), the Supreme Court also holds that this jurisdictional bar is limited to three enumerated categories in § 1252(g)—commencement, adjudication, and execution of removal orders. *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999). The Government's argument that the Court is barred from adjudicating a challenge to *detention* as inherently implicating a challenge to *removal* is incorrect, and, if left unchecked, would lead to "absurd" results. *Jennings v.*

5

(4:25CV2696)

*Rodriguez*, 583 U.S. 281, 293 (2018) (opinion of Alito, J., joined by Roberts, C.J., and Kennedy, J.). Accordingly, claims that do not seek "review of an order of removal, the decision to seek removal, or the process by which removability will be determined" are not barred by § 1252(g). *Regents of Univ. of Cal.*, 591 U.S. at 19; *Elgharib v. Napolitano*, 600 F.3d 597, 605 (6th Cir. 2010).

In this case, Petitioner does not challenge Respondents' authority or discretion to enforce the final order of removal. Rather, Petitioner requests the Court review whether: (1) Respondents lawfully revoked his supervised release; and (2) his continued detention violates due process. ECF No. 1. Such claims do not fall within the three enumerated categories set forth in § 1252(g). Therefore, the Court retains jurisdiction to resolve Petitioner's claims.

### B. APA and Procedural Due Violations

Petitioner claims that Respondents acted *ultra vires* of their statutory and regulatory authority and violated the *Accardi* doctrine by failing to comply with their own rules and procedures concerning Petitioner's supervised release revocation. ECF No. 1. Respondents insist Petitioner's supervised release revocation and subsequent detention were lawfully within ICE's discretion and consistent with its rules and procedures. ECF No. 6. Respondents further retort that any violation amounts to harmless error because Petitioner was provided with three notices concerning ICE's intention to effectuate his removal. ECF No. 6-1.

   1. *Statutory and Regulatory Framework for Removal*

Under 8 U.S.C. § 1231(a)(1), a final removal order must be effectuated within 90 days ("Removal Period"). The Removal Period may be extended if the noncitizen is: (1) inadmissible under 8 U.S.C. § 1182; (2) removable under 8 U.S.C. § 1227; or (3) a danger to the community or a flight risk. 8 U.S.C. § 1231(a)(6). After the Removal Period expires, noncitizens not yet

6

(4:25CV2696)

removed are subject to supervision pursuant to the regulations established by the Attorney General (whom has since delegated her authority to the Department of Homeland Security Secretary). 8 U.S.C. § 1231(a)(3). ICE, thereafter, promulgated Post-Order Custody Regulations ("POCR") setting forth the mechanisms concerning custody reviews, release from ICE custody, and release revocations concerning removal orders. *See* 8 C.F.R. § 241.4(l).

Under POCR, ICE may revoke an individual's supervised release: (1) when the agency determines the purpose of release has been satisfied; (2) an individual violated the conditions of release; (3) it is appropriate to enforce a removal order against an alien; or (4) any other circumstance indicating release would no longer be appropriate. 8 C.F.R. § 241.4(l)(2)(i)—(iv). The procedures for revocation are set forth in § 241.4(l)(1), which provides:

> Upon revocation, the alien will be notified of the reasons for the revocation of his or her release or parole. The alien will be afforded an initial information interview promptly after his or her return to [ICE] custody to afford the alien an opportunity to respond to the reasons for revocation stated in the notification.

8 C.F.R. § 241.4(l)(1).

2. *Respondents violated POCR and the* Accardi *doctrine.*

It is undisputed that the Department of Homeland Security and its instrumentalities have broad discretion to enforce immigration laws, including whether to revoke an OSUP. Still, government agencies, including ICE, must follow their own regulations, rules, and procedures. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954); *see Morton v. Ruiz*, 415 U.S. 199, 235 (1974) (requiring agency compliance with unpublished agency rules and manuals). As explained below, ICE did not comply with its own regulations and procedures when it revoked Petitioner's OSUP.

7

(4:25CV2696)

Respondents first argue that the procedures in § 241.4(l)(1) do not apply to Petitioner because his supervised release was not revoked due to any condition violations. ECF No. 6 at PageID #: 58–59. That argument is unpersuasive and has been rejected by other district courts within this and other Circuits as unsupported by the text or case law and inconsistent with ICE's own practice. *Mbonga v. Raycraft*, No. 4:25-cv-2315, 2025 WL 3122829, at *4 (N.D. Ohio Nov. 7, 2025) (Polster, J.); *K.E.O. v. Woosley*, No. 4:25-cv-74-RGJ, 2025 WL 255339, at *4 (W.D. Ky. Sept. 4, 2025) (Jennings, J.); *Ceesay v. Kursdorfer*, 781 F. Supp. 3 137 (W.D.N.Y. 2025); see *Zhen v. Doe*, 3:25-cv-1507, 2025 WL 2258586, at *10 n. 19 (N.D. Ohio Aug. 7, 2025) (Barker, J.) (recognizing that procedural requirements in § 241.4(l)(1) apply to noncitizens whose supervised release has been revoked for reasons other than condition violations.); *see also Barrios v. Ripa*, 2025 WL 2280485, at *2 (S.D. Fla. Aug. 8, 2025) (noting that ICE afforded an informal interview to a noncitizen detained under § 241.4(l)(2).). To adopt Respondents' interpretation would lead to a nonsensical result with individuals who violate conditions of their release receiving more process than individuals who do not. See *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972) (holding that while parolees are subject "to many restrictions not applicable to other citizens," they are nevertheless entitled to some "minimal inquiry" to determine whether detention before parole revocation is appropriate).

Next, Respondents argue that any failure to provide Petitioner with revocation notice was harmless error because three notices were provided shortly after his detention in July, September, and November 2025. ECF No. 6 at PageID #: 59; ECF No. 6-1. The regulation's text does not require notice or an informal interview *before* detention. 8 C.F.R. § 241.4(l)(1); *Jimenez v. Cronen*, 317 F. Supp. 3d 626, 651 (D. Mass. 2018). Petitioner points out, however, that none of

8

(4:25CV2696)

the notices Respondents provided include the reasons for the OSUP revocation or mentioned an opportunity to address such reasons. ECF No. 7. The Court agrees.

The 1-229(a) forms submitted by Respondents merely include instructions that Petitioner is required to cooperate with efforts to effectuate his removal, including providing ICE officers with copies of his passport, birth certificates, foreign government documentation identifying himself, and communication efforts Petitioner may have made to prepare for removal. ECF No. 6-1. There is no mention of a hearing or informal interview about his detention, nor any specific reasons for the OSUP revocation. Respondents' notices were deficient.

Finally, Petitioner argues that the revocation was unlawful *ab initio* because the individual responsible was not properly delegated the authority to revoke his release. Section 241.4(l) authorizes the Executive Associate Commissioner to revoke supervised release. Under 8 C.F.R. § 1.2, such authority is further delegated to the field office directors and any other official "delegated the function or authority . . . for a particular geographic district, region, or area." 8 C.F.R. §§ 1.2, 241.4(l)(2). Respondents did not respond to this challenge. ECF No. 6. The Court, therefore, concludes that the officer whom revoked Petitioner's supervised release acted *ultra vires*, that is without proper delegated authority, and in violation of POCR.

Based on the foregoing, the Court finds that Respondents violated the *Accardi* doctrine and Petitioner's detention violated his procedural due process rights secured by the Fifth Amendment of the United States Constitution.

### C. Petitioner's Detention is Not Unreasonable

Notwithstanding the procedural violations discussed above, Petitioner's continued detention is not unreasonable considering his impending removal to Palestine.

9

(4:25CV2696)

Under the Due Process Clause, the Government is prohibited from depriving any person of liberty without due process of law. Freedom "from government custody, detention, or other forms of physical restraint [ ] lies at the heart of the liberty that Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) (citing *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)). The Supreme Court has only recognized certain narrow, nonpunitive justifications for civil detention, including when an individual poses a danger to the community or poses a flight risk. *Id*. (citing *Kansas v. Hendricks*, 521 U.S. 346, 363 (1997)).

In *Zadvydas*, the Court considered two cases in which removal was ordered but the receiving states (in Zadvydas' case, Germany and Lithuania, and in Ho Ma's case, Cambodia) refused to accept them for various reasons. *Id*. at 684–86. The Court found that Congress did not intend to authorize the Attorney General to detain such individuals indefinitely, even if the reason is to protect the community from dangerous aliens. *Id*. at 697. Interpreting the statute's text, the Court held that "once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute." *Id*. at 699. The Court recognized that a six-month detention period is "presumptively reasonably," after which, the Government must proffer sufficient evidence that there is a significant likelihood of removal in the reasonably foreseeable future. *Id*. at 701.

The Court acknowledges that when Petitioner was detained in June 2025, Respondents did not have any travel documents or plans to remove him to Palestine. This is shown by the email communications with Officer Serevitch six months later, in December 2025, in which he acknowledged that ICE was still waiting for approval from the Palestinian Authority to issue travel documents. ECF No. 1-4. Although Petitioner has been detained in excess of six months, Respondents have demonstrated to the Court's satisfaction that removal is significantly likely in

10

(4:25CV2696)

the reasonably foreseeable future. Respondents declare that Petitioner is slated for one of two missions to the occupied Palestinian territories on either January 20, 2026, or February 1, 2026. ECF No. 10. Furthermore, Respondents aver that they have provided Petitioner's information to the Israeli government and anticipate receiving special transit permission necessary to enter the occupied Palestinian territories. ECF No. 10.

While recent events fuel legitimate skepticism, there is no evidence that the declaration is made in error. Because the Government has pledged that Petitioner's removal is likely to occur within days, his continued detention is not unreasonable. The Court reaches this conclusion by relying on the declarations of Officer Serevitch. In those declarations, he attests that removal should begin by January 16, 2026, with Petitioner being transported outside of the United States between January 20 and February 1, 2016. If Petitioner is no longer slated for one of the two missions destined for Palestine, Petitioner can refile a petition for writ of *habeas corpus* in the district having jurisdiction.

### III. CONCLUSION

For the reasons stated herein, the Court finds that: (1) Respondents acted *ultra vires* when an unauthorized official revoked Petitioner's order of supervision; and (2) Respondents violated the *Accardi* doctrine by failing to provide Petitioner with notice of the reason(s) for the revocation of his supervised release or afford him an opportunity to respond to such reasons. Therefore, Respondents' Motion to Dismiss (ECF No. 6) is denied.

Notwithstanding the procedural violations, Petitioner's continued detention is not unreasonable because the record includes plausible evidence that his removal to the occupied Palestinian territories is significantly likely in the foreseeable future, with travel beginning on

11

(4:25CV2696)

January 16, 2026, and concluding by February 1, 2026.  Accordingly, Petitioner's writ for *habeas corpus* (ECF No. 1) is denied.

On or before 4:00 p.m. on February 2, 2026, Respondents shall submit to the Court written confirmation that Petitioner was removed from the United States to the occupied Palestinian territories.

IT IS SO ORDERED.

| | |
|---|---|
| January 13, 2026 | */s/ Benita Y. Pearson* |
| Date | Benita Y. Pearson |
| | United States District Judge |